27 N.J. Super. 204 (1953)
99 A.2d 52
THE PROPRIETARY ASSOCIATION, AN UNINCORPORATED ASSOCIATION, MORRIS I. ZIEPER, AN INDIVIDUAL, AND JOHN HAROOTUNIAN, AN INDIVIDUAL, PLAINTIFFS,
v.
BOARD OF PHARMACY OF THE STATE OF NEW JERSEY, GUY R. LUONGO, INDIVIDUALLY AND AS PRESIDENT OF THE BOARD OF PHARMACY OF THE STATE OF NEW JERSEY, STEPHEN M. DUSCHOCK, INDIVIDUALLY AND AS A MEMBER OF THE BOARD OF PHARMACY OF THE STATE OF NEW JERSEY, EPHRAIM G. SLESS, INDIVIDUALLY AND AS A MEMBER OF THE BOARD OF PHARMACY OF THE STATE OF NEW JERSEY, BERNARD GERSON, INDIVIDUALLY AND AS A MEMBER OF THE BOARD OF PHARMACY OF THE STATE OF NEW JERSEY, WILBUR E. POWERS, INDIVIDUALLY AND AS SECRETARY OF THE BOARD OF PHARMACY OF THE STATE OF NEW JERSEY, AND THEODORE D. PARSONS, THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided July 20, 1953.
*206 Mr. Thomas J. Brogan, attorney for plaintiffs (Mr. James F. Hoge and Mr. George M. Chapman, of the New York Bar, appearing).
Messrs. Lorentz & Stamler, attorneys for defendants (Mr. Joseph F. Stamler appearing).
Mr. Theodore D. Parsons, Attorney-General.
COLIE, J.S.C.
This is a declaratory judgment action brought by The Proprietary Association, an unincorporated association, Morris I. Zieper and John Harootunian, who operate respectively a tobacco and a grocery store. Both individuals sell or sold packaged medicines. The defendants are the Board of Pharmacy of the State of New Jersey, its members, and Theodore D. Parsons, Attorney-General of New Jersey.
The action was instituted after the Board of Pharmacy, purportedly acting under the authority of R.S. 45:14-1 et seq., had in some instances brought suit against certain sellers of packaged medicines where a registered pharmacist was not present or supervising, and had warned others, in a like category, to discontinue such sales. After numerous preliminary steps, none of which are of importance to the main issues, the case was tried for 11 days before the court without a jury.
*207 The complaint sought a judicial determination of the meaning of the terms "patent medicines," "proprietary medicines," and "domestic remedies" as are used in R.S. 45:14-29. At the end of the trial, plaintiffs abandoned the prayer for a definition of "domestic remedies." The counterclaim sought a declaration as to the meaning of the phrase "making and vending," the word "non-poisonous" and the words "patent or proprietary medicines" as used in the same section.
The pertinent sections of the Pharmacy Act are:
R.S. 45:14-6.
"No person, not a registered pharmacist within the meaning of this chapter, shall conduct any store or pharmacy, or employ any unregistered pharmacist or unregistered assistant for retailing, dispensing or compounding drugs, medicines or poisons, and no person not a registered pharmacist or a registered assistant, shall prepare and dispense physicians' prescriptions, or retail or dispense medicines or poisons, except under the immediate supervision of a registered pharmacist. This section shall not be so construed as to prohibit the employment of apprentices in pharmacies or drug stores, but they or other unregistered employees shall not be allowed to prepare, compound and dispense prescriptions, or to sell or furnish medicines, prescriptions or poisons, except in the presence of and under the personal supervision of a registered pharmacist of this state, who must either be the proprietor or owner of said store or pharmacy, or in the actual employ of such proprietor or owner. For the violation of this section the owner or proprietor of said store or pharmacy shall be equally liable as principal."
and R.S. 45:14-29:
"Except as otherwise provided as to barbital or any other hypnotic or somnifacient drugs, nothing in this chapter shall be construed to apply to or in any manner interfere with the strictly professional pursuits of any physician, the making and vending of nonpoisonous patent or proprietary medicines, the sale of simple nonpoisonous domestic remedies by retail dealers in rural districts, nor the ownership of any pharmacy or store, in whole or in part, by a person not a registered pharmacist, if such pharmacy or store is at all times in charge of a registered pharmacist. Any person holding any certificate of registration granted under any former act, with the renewal certificate thereof, shall be considered a registered pharmacist within the meaning of this chapter."
*208 To detail the testimony would clutter the record needlessly. Suffice it to say that the witnesses, many of whom were outstanding in their respective fields of medicine and pharmacology, were in disagreement on some points and surprisingly in accord on others. The consensus of the testimony was to the effect that the terms "patent" and "proprietary," as used in connection with medicinal purposes were, in common parlance and the trade, often used interchangeably. John J. Debus, a registered pharmacist and secretary of the New Jersey Pharmaceutical Association, testified that as of 1951 the term "patent and proprietary medicines" was a bastard term of a general description of trade-marked medicines, one which had gotten into general usage but that as of earlier years, a patent medicine was one on which a patent had issued, and a proprietary medicine was one in which the owner or producer had a proprietary interest by virtue of its ingredients or composition being secret. Mr. Jacob Eisen, a registered pharmacist since 1927, a defense witness, testified that packaged medicines were generally known as patent or proprietary medicines. David L. Cowen, professor at Rutgers University who had made an intensive study of the history of pharmacy covering the period ending in 1901, testified that originally the term "patent medicine" connoted a medicine upon which letters patent had issued, that by the turn of the century the terms patent and proprietary became exceedingly confused in the literature, were used interchangeably and the term "patent" began to be used as a comprehensive term including any medicine at all in which there was any degree of secrecy or private ownership and that the term "proprietary medicine" came to have essentially the same significance. This witness further stated that as of 1901 the sine qua non of proprietary medicines was not the branding of it but the secrecy involved. For the plaintiffs, Dr. Frederick J. Cullen testified that the terms "patent," "proprietary" and "domestic" remedies were all in the same category; that the terms mean a completely packaged medicine sold under a trademarked name, protected under that name, and indicating use and directions *209 for use on the label; that in the broad definition patent and proprietary are generally tied together. Dr. Maurice H. Seevers, professor of Pharmacology at the University of Michigan, testified that the term proprietary implied the exclusive right for protection from free competition of any compound of any nature by some process, whether the process be a trademark, or by secrecy, or by copyright, or by any means; that there was no clear-cut distinction between the terms patent and proprietary but that there was such between the terms patent and patented, the latter connoting the protection by a patent registered in the Patent Office.
Numerous witnesses testified to instances where pharmacists had, in isolated instances, warned customers of the potential dangers inherent in the use of some packaged medicines and of other incidents when pharmacists had checked with the attending physicians to verify that it would be wise and proper to sell certain packaged drugs to a given customer. There also was testimony of instances where fatal or near-fatal results had followed upon self-medication with packaged medicines. One instance was of a fatal case where a man had ingested between 75 and 100 grains of aspirin within a three-hour period; another was a fatal result due to boric acid poisoning to an infant of tender years and a similar case of a near-fatal result; yet another of acute ferrous sulphate poisoning involving two infants of 15 and 18 months of age. One infant had taken 15 five-grain tablets, the other 15 or 20, each within a brief period. In these cases the infants had ingested the tablets, unbeknownst to the mother, and in the home. These cases are demonstrative of the fact that poisoning may result from excessive dosage regardless of whether or not the sale be by or under the supervision of a pharmacist, or by an untrained sales clerk. It is noteworthy that the ferrous sulphate cases resulted from ingestion of tablets that were subscribed by a physician. All the evidence points unerringly to the fact that, once the medicine has come into the hands of the consumer, no supervision of sales will guard against the misuse thereof. There was uncontroverted evidence of lipid pneumonia following *210 the use of certain nose drops in a petrolatum excipient; of brain tumor symptoms masked by the use of headache alleviatives; of the harmful effects of certain medicines if used by a diabetic. The court took judicial notice of the fact that some storekeepers in New Jersey were incapable of reading the instructions on packaged medicines. This line of evidence was adduced for the purpose of refuting the plaintiffs' contention that the pharmacist served no useful purpose so far as the selling of packaged medicines is concerned.
The pharmacy act in New Jersey was enacted in 1877. L. 1877, c. 133. The portion pertinent to the problem before the court then read:
"That any person not being or having in his employ a registered pharmacist, within the meaning of this act, who shall, after the first day of January, one thousand eight hundred and seventy-eight, keep a pharmacy or store for retailing or compounding medicines, or who shall take, use or exhibit the title of registered pharmacist, shall, for every such offence, be liable to a penalty of fifty dollars; such penalty to be sued for and recovered by the board of pharmacy hereinafter mentioned, in the same manner provided by the statutes of this State for the recovery of penalties in other qui tam actions; provided, that nothing in this act shall apply to or in any manner interfere with the business of any physician, nor prevent him from supplying to his patients such articles as may seem to him proper, nor with the making or vending of patent or proprietary medicines, nor with the sale of the usual domestic remedies by retail dealers in rural districts."
In 1886, L. 1886, c. 123, the above proviso was changed to read: "nor with the sale of simple domestic remedies by retail dealers in rural districts one-half mile or more remote from a regular pharmacist * * *." In 1895, L. 1895, c. 189, the statute was amended to read: "* * * nor with the making or vending of non-poisonous patent or proprietary medicines, nor with the sale of simple non-poisonous domestic remedies by retail dealers in rural districts * * *." In 1901, L. 1901, c. 51, the exemption was amended to read: "* * * nor with the making and vending of non-poisonous patent or proprietary medicines, nor with the sale of simple non-poisonous domestic remedies by retail dealers in rural *211 districts * * *." This language was carried forward into the Revision of 1937 and is quoted earlier in the opinion as R.S. 45:14-29. The significant changes are "simple domestic" for "usual domestic remedies" in 1886, and the 1901 change from "making or vending" to "making and vending." In 1901 the Legislature enacted provisions having to do with the dispensing of certain poisons, listing them in a schedule. In 1919 the schedule was enlarged and later incorporated in the Revision of 1937. After listing specific poisons, the Legislature added the following: "* * * or any other drug, chemical substance, or preparation which, according to standard works on medicine, materia medica, or toxicology, is liable to be destructive to adult human life in doses of five grains or less" and "* * * any other drug, chemical, substance, or preparation which according to standard works on medicine, materia medica, or toxicology, while not considered as toxic in doses of five grains or less is, nevertheless, liable to be destructive of adult human life in doses of sixty grains or less." These provisions appear in the present Pharmacy Act as R.S. 45:14-19 and 20 but obviously they do not define "poison." By R.S. 45:14-3, the Board of Pharmacy is authorized to make rules and, in accordance therewith, it defined "drug" or "medicine" in the following language:
"(1) articles recognized in the Official United States Pharmacopoeia, Official Homeopathic Pharmacopoeia of the United States or Official National Formulary or any supplement to any of them; and (2) articles intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease in man or other animals; and (3) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (4) articles intended for use as a component of any article specified in clauses (1), (2), or (3), but does not include devices or their components, parts or accessories."
There are no New Jersey decisions which shed light on the problems raised in this case. In Board of Pharmacy of State of New Jersey v. Braunstein, 2 N.J. Misc. 454 (Sup. Ct. 1924), the court said that the purpose of the statute *212 "was manifestly to protect the public from the dangers attendant upon the sale of poisons and powerful drugs to the public without the protection afforded by the skill and qualification necessary to safeguard the public use." In Board of Pharmacy v. Abramoff, 6 N.J. Misc. 437 (Sup. Ct. 1928), camphorated oil was held to be neither a patent nor proprietary medicine. In Kratky v. Board of Pharmacy, 7 N.J. Misc. 970 (Sup. Ct. 1929), camphorated oil and essence of peppermint were held to be medicines. In Board of Pharmacy of New Jersey v. Hutchin, 10 N.J. Misc. 641 (Sup. Ct. 1932), essence of peppermint and sweet spirits of nitre were held to be medicines. In Board of Pharmacy v. Quackenbush & Co., 22 N.J. Misc. 334 (Com. Pl. 1940), "Vitamins Plus" was held not to be a medicine. In Crescent Bottling Works v. Board of Pharmacy, 121 N.J. Eq. 237 (E. & A. 1937), the court held that a product known as "Duke's Magnesia Sitro-Tartrate" was not a proprietary medicine within the exception of the language of the then section 9 of the Pharmacy Act.
In this situation the court has had recourse to decisions in other states, and, in one instance, of another nation. A study of these cases indicates two diametrically opposed points of view, but the logic of the situation is expressed in State v. Donaldson, 41 Minn. 74, 42 N.W. 781 (Sup. Ct. 1889). There the court had before it the question of the construction of the phrase "or from dealing in and selling of patent or proprietary medicines." In reversing the judgment for a penalty for having sold "one bottle of Fellows' Compound Syrup of Hypophosphates and one bottle of Ayer's Sarsaparilla" the court said:
"It is a matter of common knowledge that what are called `patent' or `proprietary' medicines are prepared ready for immediate use by the public, put up in packages or bottles labeled with the name, and accompanied with wrappers containing directions for their use, and the conditions for which they are specifies. * * * There is nothing that calls into use any skill or science on the part of the one who sells them. * * * The fact that the seller is a pharmacist, of itself, furnishes no protection to the public." *213 In Noel v. People, 187 Ill. 587, 58 N.E. 616, 617, 52 L.R.A. 287 (Sup. Ct. 1901) the court had before it the appeal of Theodore Noel from a judgment imposing a fine for violation of the Pharmacy Act of Illinois for having sold two ounces of a powder labelled "concentrated compound extract of vitae-ore elixir." The statute prohibited persons not pharmacists from conducting a store for the retailing of drugs, medicines or poisons and exempted from that prohibition "the sale of patent and proprietary medicines and domestic remedies by retail dealers in localities as hereinafter provided." In the course of its opinion the court held that the public health is not protected by limiting sales of patent and proprietary medicines and remedies to registered pharmacists who make no examination of that which they sell and cited with approval State v. Donaldson, supra. In State v. Child, 32 Ariz. 222, 257 P. 366, 54 A.L.R. 736 (Sup. Ct. 1927) and State v. Wood, 51 S.D. 485, 215 N.W. 487, 54 A.L.R. 719 (Sup. Ct. 1927), the Pharmacy Acts of those two states were held to be unconstitutional, the Arizona court saying that insofar as it restricted the sale of patent or proprietary medicines to pharmacists, it did not reasonably promote the public health, safety or welfare, and that in making such sales, the pharmacists performed no duty which could not be performed as well by an intelligent person. In the South Dakota case, the court was unable to find that restricting such sales to pharmacists tended to protect the public health and that therefore such restriction was unreasonable. In People v. Heron, 34 Cal. App.2d Supp. 755, 90 P.2d 154 (Cal. Super. 1939) the defendant, Heron, not being a registered pharmacist or assistant pharmacist, was convicted of having sold a bottle of eucalyptus oil in violation of the California statute. The judgment was reversed, the court saying:
"Strictly speaking, one may say that a patent medicine is only one which is protected by a patent. Also, it is possible to say a proprietary medicine is only one which is protected by a patent, for in no other way does a `proprietor' secure an exclusive right of property in its manufacture. But, and of this we take judicial *214 notice (citing cases), in the period between 1890 and 1910, even more than today, a preparation was commonly known as a patent or proprietary medicine, dependent not on the fact that it was protected by a pateent, nor on the fact that, thanks to a secret imparted by an Indian chief or obtained by years of laboratory research, its maker actually had a secret formula or process,  though in such cases the medicine would doubtless be proprietary  but on the dress in which it was offered to the public. Protected by no patent, and even though others might actually be manufacturing the same article, a medicine was commonly referred to as a patent or proprietary medicine if its proprietor gave it a trade name, or his name, offered it to the public as his product, put it up in a distinctive container, and expressly or impliedly claimed special virtue for it because of the special formula, skill or care which went into its manufacture.
As one out of several, similar, possible illustrations of the meaning with which the words `patent medicines' were commonly used in the early years of this century, we refer to an article in the July, 1906, issue of `The Review of Reviews.' In this article, entitled `The So-Called "Patent-Medicine" Evil,' the adjectives `patent' and `proprietary' are used interchangeably, and it is evident throughout that the medicines under discussion are not limited to those actually patented or actually made by a secret process or from a secret formula."
In Wrigley's Stores, Inc., v. Michigan Board of Pharmacy, 59 N.W.2d 8 (Mich.) the Supreme Court filed its opinion June 8, 1953. The plaintiffs filed a complaint seeking a declaratory judgment and an injunction against the Board of Pharmacy to restrain the board from applying the Pharmacy Act of that state against plaintiffs, respecting the sale of patent or proprietary medicines or drugs and ordinary domestic or household remedies. From a decree for the plaintiffs, the defendant appealed, and there was a unanimous affirmance. The Board of Pharmacy contended in that case that the words "patent" or "proprietary" medicines embraced only preparations protected by letters patent or consisting of a secret, privately-owned formula, or manufacturing process. In disposing of that argument, the court said [59 N.W.2d 12]:
"We conclude that the permission given by Sec. 18, to sell patent or proprietary medicines, was not intended to be limited to the rare class of patented medicines or secret formulas, but does include authorization to sell prepackaged, non-prescription, mass *215 produced remedies put up for sale to the general public in the distinctive and original container, and under the trade name of the manufacturer as his product under the rules and conditions set forth in the act.
The intent of the legislature is disclosed (all of the acts hereinbefore recited or referred to, being considered) as permitting ordinary or domestic household remedies as well as so-called patent or proprietary medicines, to be sold without the supervision of a registered pharmacist, under the rules and conditions set forth in the pharmacy act."
The court's attention has been drawn to the case of Culver v. Nelson, 54 N.W.2d 7, 12 (Minn. Sup. Ct. 1952). In that case the court held that the sale of certain vitamin preparations was in violation of the Minnesota Pharmacy Act, and affirmed the judgment of the lower court. The action was for a declaratory judgment, and the court's opinion was largely devoted to the question of whether the product was a food or a drug, and the court held that it did not fall within the exemption of the Minnesota statute as to harmless, non-habit-forming proprietary medicines. The court said that "While it is difficult to exactly define proprietary medicines, it is much less difficult to determine those preparations which are not proprietary medicines, and that is as far as we need go." It is obvious that the court did not define a proprietary or patent medicine but was content to determine that the particular vitamins involved in the suit were not proprietary medicines. The defendants relied heavily upon the decision in Woolworth's, Ltd., al. v. Wynne (Ct. App. New Zealand, 1951). The dissenting opinion said, in part:
"A proprietary medicine is a medicine in respect of which the manufacturer or dealer (the proprietor) has a proprietary right  that is to say, a right to prevent others from making or selling it at all, or a right to prevent them from making or selling it under the name he uses, or the particular manner or form in which he makes or sells it. There can be no such right in the absence of a claim thereto, express or implied; but it is immaterial whether the claim is an express claim, based on letters patent or on a registered trade mark or made in any other way, or whether it arises only by implication from the manner and mode of sale. The implication will usually, if not invariably, *216 rest on the use of a particular name under which the medicine is sold. The proprietary claim must, I think, have a legal foundation, in the sense that it will be protected in some way by the law, even if only through the medium of a passing-off action. The distinguishing characteristics are, therefore, the proprietary claim, sufficiently asserted, and the existence of some legal basis for the claim."
The opinion, with devastating logic, demolishes the idea that the term "proprietary medicine" connotes secrecy.
Appletons' Medical Dictionary, published in 1904, defines "proprietary" as "Of medicinal preparations, constituting the property of an individual or corporation that, by copyrighting the name or otherwise, has or professes to have the exclusive right to produce and vend them." The Board of Pharmacy of the State of New Jersey in its 49th Annual Report submitted to the Governor of the State and covering the period from July 1, 1949 to June 30, 1950 recognized the weakness of the position which it takes in this case, for its report says: "The owners of super-markets and other general store establishments are encroaching more and more upon the sale of drug items under an out-dated provision in the law enacted many years ago when New Jersey was more of a rural state, which permits the sale by any merchant of non-poisonous patent or proprietary medicines." (Italics mine). At the annual convention of the American Pharmaceutical Society in 1915, that organization, which in the course of this trial was facetiously referred to as the "High Priesthood of Pharmacy," in speaking of proprietary medicines said:
"In its widest sense, a proprietary medicine is any drug, chemical or preparation, whether simple or compound, intended or recommended for the cure, treatment or prevention of disease, either of man or of lower animals, the exclusive right to the manufacture of which is assumed or claimed by some particular firm or individual, or which is protected against free competition as to name, character of product, composition or process of manufacture by secrecy, patent, copyright, trade-mark, or in any other manner."
The Pharmacy Act in New Jersey, according to Professor Cowan, was modeled on the Rhode Island statute and it is *217 singularly significant that that state uses the following language: "Proprietary medicines [or remedies], popularly called patent medicines." As to the argument that the word "patent" carries with it the implication that the product is one on which letters patent have issued, little need be said beyond the fact that numerous instances will be found in the statutes of New Jersey where the Legislature has seen fit, as in subsection 20 of section 4 (f) of chapter 241 of the Laws of 1922 "(f) Patented, patent and proprietary medicines that are unfit for use for beverage purposes," to distinguish between "patent" and "patented."
The defendants urge that the phrase "simple nonpoisonous domestic remedies" as used in R.S. 45:14-29 and which, prior to the 1886 amendment, read "usual domestic remedies" refers to herbs or herbal products. The complete answer to this argument is that no dictionary which the court could find gives to the word "simple," used as an adjective, a meaning in anywise related to the practically obsolete noun "simple," meaning an herb.
It will be recalled that the Pharmacy Act up until 1901 read: "the making or vending of patent or proprietary medicines" and that in the latter year the disjunctive "or" was dropped and the conjunctive "and" substituted. Our courts for years have recognized the laxity in the use of the words "or" and "and," and it is settled law that the words are interchangeable and that one may be substituted for the other if such substitution is consistent with the legislative intent. Murphy v. Zink, 136 N.J.L. 238 (Sup. Ct. 1947), affirmed 136 N.J.L. 635 (E. & A. 1948). It seems clear that the legislative intent was that the disjunctive was meant. Had the Legislature intended in 1901 to have restricted the exception in the statute to the cases where the maker and vendor were one and the same, the effect would have amounted to an emasculation of the exception. The words "patent" or "proprietary" have had practically identical meanings from 1877 to the present and, so generally the courts have held, from 1889 to 1953.
*218 The court declares the meaning of the words "patent" or "proprietary" medicines as used in R.S. 45:14-29 to mean:
"Completely compounded packaged drugs, medicines and non-bulk chemicals which are held out for sale and sold by or under the authority of the proprietor thereof directly to the general public and the packages of which drugs, medicines and non-bulk chemicals bear, or are accompanied by, printed matter specifying affections, symptoms or purposes for which the remedies are recommended and the directions for their use, and with respect to which ownership is claimed or asserted by the proprietor thereof as to name, composition or process of manufacture, by secrecy, patent, trademark, copyright, or in any other manner which may be the basis for legal action by the proprietor with respect to said drugs, medicines and non-bulk chemicals in any of the courts of this state."
The word "non-poisonous" as used in R.S. 45:14-29 is defined to mean:
"A substance that, being in solution in the blood or acting chemically on the blood, neither destroys life nor impairs seriously the functions of one or more of the organs."
The regulation of the Board of Pharmacy defining "drug" and "medicine" in the following language:
"(1) articles recognized in the official United States Pharmacopoeia, official Homeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; and (2) articles intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease in man or other animals; and (3) articles (other than food) intended to affect the structure of any function of the body of man or other animals; and (4) articles intended for use as a component of any article specified in clauses (1), (2), or (3); but does not include devices or their components, parts, or accessories."
is declared to be unreasonable on the ground, and for the reasons hereinabove stated, that it bears no reasonable relation to the public health, safety and welfare.