BAMBU SALES, INC., Plaintiff,

v.

Kenneth GIBSON, Mayor and Charles M. Zizza, Chief of Police, respectively, of the City of Newark, Defendants.

Civ. No. 79–2195.

United States District Court, D. New Jersey.

Aug. 6, 1979.

Maurice Bitner, Parsippany, N.J., Noel C. Hauser, New York City, of counsel, for plaintiff.

Salvatore Perillo, Corp. Counsel, by Jonathan Irons, Asst. Corp. Counsel, Newark, N.J., for defendants.

OPINION

BIUNNO, District Judge.

This is a civil rights case grounded on 42 U.S.C. § 1983 and § 1985, with jurisdiction arising under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(3) and (4) (civil rights claims).

The remedies sought are a declaratory judgment, 28 U.S.C. § 2201 and § 2202, and injunctive relief.

The controversy arises from the enactment of Ordinance 6S and FD by the City of Newark on June 20, 1979, the ordinance thereafter having been delivered to Mayor Gibson on June 21, 1979 and returned without veto on June 22, 1979.

The ordinance is captioned as one "prohibiting the sale or display of paraphernalia relating to controlled dangerous substances." The major provision here is section 1:

"No person shall advertise, display, sell or offer to sell any type of syringe, needle, eye dropper, spoon, pipe, testing kit, rolling paper, or other paraphernalia or appliance designed for or ordinarily used in smoking, testing, weighing, measuring, injecting, cooking or sniffing marijuana, cocaine, opium, hashish or other controlled dangerous substances as defined by N.J.S.A. 24:21–1, *et seq.*"

Section 2 is also involved to the extent that the maintenance of any building, conveyance or premises resorted to by persons for the distribution of any of the articles listed in section 1 is declared to constitute a common nuisance.

The penalty for violation is set at a fine of $500. or a jail term of 90 days or both, section 4.

The matter first came before the court on application (on notice) for an order to show cause why a preliminary injunction should not issue to restrain enforcement of the ordinance. That order issued July 25, 1979, with temporary restraint. On its return date, on August, 2, 1979, the court invited the parties' views on the question whether the case was one suitable for application of F.R.Civ.P. 65(a)(2), for advancement of the trial on the merits and consolidation with the application for preliminary injunction. After discussion, the parties agreed that the facts needed for resolution of the issues were not in dispute, and that what remained were matters of law.

The facts set out in the moving affidavit of Harry Gurewitz, plaintiff's president, filed July 24, 1979, but not those parts of the affidavits as are in the nature of inferences, charges, argument or conclusion, could be employed by the court as they were not in dispute. Other fact items were enumerated in the hearing record as also not in dispute and available for consideration.

Briefly, Bambu Sales, Inc. is a New York corporation with offices and warehouse in Westbury, N.Y. It is the sole distributor in the United States for cigarette paper manufactured by a Spanish company, although the same kind of product is sold throughout this country by others, some of which are manufacturers of leading brands of cigarettes. Plaintiff's merchandise, essentially its only item, is marketed under the name "Bambu", registered as a federal trademark under the Lanham Act.

Plaintiff sells only to wholesalers (one of whom is in Newark, N.J.) who, in turn, supply jobbers and sub-jobbers from whom retail merchants obtain their supplies. Some number of these retail merchants are in the City of Newark and possess inventories of Bambu cigarette paper.

It is agreed that "cigarette paper" as distributed by plaintiff, and "rolling paper" as used in the ordinance, are one and the same, namely, a rectangle of very thin paper, with a thin gummed line along one long edge, which is used to form the outer tube or container of a cigarette either by rolling it by hand or in a machine. The use of this paper for the purpose is as old as the cigarette, the Bambu brand itself having been sold in this country for at least 50 years.

The traditional and conventional form of cigarette is that containing tobacco. Tobacco itself is said to have originated in Mexico about 5,000 B.C., its earlier use being by smoking as cigars or cigarettes, and later in pipes. It was also chewed, or, in a finely divided form known as snuff, inhaled. Tobacco is said to have been the primary product of the "New World" to have achieved the immediate and worldwide acceptance it did once the explorers were followed by merchants and traders. It is said to have reached Spain and Portugal by 1558, France by 1559, Italy by 1561, England in 1565, Turkey in 1605, Russia by 1634 and Arabia by 1663. Spanish traders took it to the Philippines, from where it went to China, Siberia and back to America among the Eskimos. It was traded to the Pacific islands and to Africa, and its worldwide use is said to have been adopted within a hundred years. See, "Lincoln Library of Essential Information" 34th Ed. (Frontier Press, 1971), pp. 2133–2134.

While most cigarettes are no doubt those sold as a finished product, there has been and still is both a demand and a market for its components, i. e., loose tobacco and cigarette or rolling paper as marketed by Bambu and its competitors so that ultimate consumers who prefer to roll their own may do so. Bambu's trade is both in foreign commerce (being imported from Spain) and interstate commerce (being distributed down the line to the eventual retailer).

On its face, the ordinance does not purport to deal with cigarette paper in conjunction with tobacco, which is not a controlled dangerous substance either under the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.Code § 801, et seq., or the N.J. Controlled Dangerous Substances Act, N.J.S.A. 24:21–1 et seq. (essentially the Uniform Act) adopted as N.J.P.L. 1970, c. 226, whose purpose it is to suppress illegal traffic in narcotic drugs enumerated in it, *State v. De Carlo*, 67 N.J. 321, 338 A.2d 809 (1975). Either the Uniform Controlled Dangerous Substances Act (in most instances) or the Uniform Narcotic Drug Act has been adopted in 47 states, the District of Columbia, the Virgin Islands and Puerto Rico. See table preceding N.J.S.A. 24:21–1 (1979 pocket part, p. 96).

Marijuana, however, is listed as a Schedule I controlled dangerous substance, N.J.S.A. 24:21–5(e)(10) (where it is spelled "marihuana"). And, like tobacco, corn silk or other combustible substance, it may be employed as the substance rolled into a paper tube to form a cigarette. It is at least this use at which the ordinance is aimed, so far as pertinent here.

### The Complaint

The complaint presents challenges to the validity of the ordinance in seven counts:

1. The ordinance places an impermissible burden on interstate commerce (*U.S. Const.* Art. I, § 8, par. 3); invades an area preempted, pursuant to the Supremacy Clause, by virtue of the enactment of the Food, Drug and Cosmetic Act, Title 21 U.S.C., and preempted by the State of New Jersey by the enactment of N.J.S.A. 24:21–1, et seq. [See, e. g., *Summer v. Teaneck*, 53 N.J. 548, 251 A.2d 761 (1969)].

2. The ordinance impairs the obligation of contracts contrary to *U.S.Const.* Art. I, § 10, cl. 1 (and see *N.J.Const.*, 1947, Art. 4, § 7, par. 3).

3. The ordinance deprives plaintiff of due process of law contrary to *U.S.Const.* Amend. 14 for lack of a rational relation between the provisions of the ordinance and the seeming objective of reducing the use of marijuana in cigarette form, and because the means selected to that end present an unreasonable, burdensome and unworkable

method of control (i. e., arbitrariness). The ordinance also violates plaintiff's procedural due process rights due to the effect of precluding its (lawful) business operations.

4. The ordinance is overly broad and vague, arbitrary and capricious, and thus contrary to *U.S.Const.* Amend. 14 (due process).

5. The ordinance violates the privacy rights of prospective users of plaintiff's product (for tobacco?) contrary to *U.S. Const.* Amends. 1, 4 and 9.

6. The ordinance deprives plaintiff of equal protection of the laws contrary to *U.S.Const.* Amend. 14 by invidiously discriminating against plaintiff by arbitrary and capricious treatment having no rational relation to any legitimate government purpose.

7. The ordinance deprives plaintiff and the public of rights of free speech and press, contrary to *U.S.Const.* Amend. 1, insofar as it prohibits advertising.

*The Pre-emption issue*

A. *Federal Law.*

■ The claim that the subject of the ordinance is pre-empted by the federal statute on controlled dangerous substances (which include marijuana, cocaine, opium and hashish among others), 21 U.S.C. § 801, et seq. cannot be sustained.

In the first place, that Act recognizes that many of the drugs dealt with have a useful and legitimate medical purpose and are needed for health and general welfare, while illegal flow and improper use of controlled substances have a substantial and detrimental effect on health and general welfare, 21 U.S.C. § 801(1) and (2).

In the second place, the design of the Act is to regulate, channel and permit the manufacture, distribution and dispensing of controlled substances through a system of control by registration, labeling and packaging, quotas, record keeping and prescription requirements, 21 U.S.C. §§ 821–829.

The major forms of prohibited conduct are aimed at the knowing or intentional manufacture, distribution, or possession with the intent to engage therein, of controlled dangerous substances (or their counterfeits) "except as authorized by this title," 21 U.S.C. § 841(a). Thus, the manufacture, distribution and dispensing of these items within the regulatory framework is recognized as lawful, while the same activities outside the regulatory framework are unlawful. Use for undesirable purposes, or mere possession for such purposes, is not reached directly, although simple possession without the support of a valid prescription or under other authorized conditions is made a lesser offense without regard to use or intended use, 21 U.S.C. § 844.

Nothing in the Act addresses devices or implements that may be employed for improper uses, nor does the Act attempt to reach improper use of substances lawfully possessed. No doubt some substances may be put to undesirable use without the support of any device or implement. For others, some kind of device or implement may be necessary or convenient to the undesirable application.

While marijuana may no doubt be used by simply burning it in a saucer, ashtray, pot or other convenient vessel so as to permeate the atmosphere, its commonest use is as a cigarette using marijuana instead of tobacco. Smoking pipes are also used, no doubt. For substances where the undesirable use involves injection under the skin or into the blood stream, the hypodermic needle is certainly necessary. Yet the federal law does not address cigarette paper, smoking pipes or hypodermic needles.

The indication, from this analysis, that no pre-emption was intended in respect to devices or implements need not be the basis for the ruling here. This is because the Act expressly declares that no provision may be construed to indicate a Congressional intent to "occupy the field" to the exclusion of State law on the subject matter, 21 U.S.C. § 903. In fact, the Act commands the Attorney General to "cooperate with" *local* and State officials on the subject, 21 U.S.C. § 873 (emphasis added). What is significant here is that the disavowal of pre-emption and the command to cooperate apply to

the dangerous substances themselves. Since the Act itself does not reach use, or possession for use, or any devices or implements to make use possible, the claim of federal pre-emption is without support.

### B. State Law.

The question of pre-emption by local statute, i. e., the N.J. Controlled Dangerous Substances Act, N.J.S.A. 24:21–1, et seq. requires a somewhat different analysis in several respects, and in other respects somewhat similar.

First, local government units are creatures of the State, have only such authority as state law gives them, and the State may alter or abolish them in any way it chooses. There is no State guarantee of local self-government, although the political pressures for "home rule" are no doubt strong and vigorous through the ballot box. See, for example, *Allison v. Corker*, 67 N.J.L. 596 at 603, 52 A. 362 (E & A, 1902); *Hermann v. Town of Guttenberg*, 63 N.J.L. 616, 44 A. 758 (E & A, 1899); *Alexander v. City of Elizabeth*, 56 N.J.L. 71 at 76, 28 A. 51 (Sup., 1893). But see *N.J.Const.* 1947, Art. 4, § 7, par. 10, authorizing private, special or local laws regulating the internal affairs of a municipality or county when petitioned by it, and par. 11, enjoining liberal construction in favor of municipalities or counties and conferring incidental powers.

This structure and relationship are quite unlike those of the several States and the federal government. The event of independence constituted each State an independent sovereign. The Articles of Confederation (designed, incidentally, to include Canada) were ratified on various dates from July 9, 1778 to March 1, 1781, and did little more than to provide for a Congress of the States, in a kind of treaty of friendship for common defense, security of liberties and general welfare. Privileges and immunities were assured to the free citizens in the several States along with the right to travel freely from State to State (paupers, vagabonds and fugitives from justice excepted). There were provisions for extradition, for "full faith and credit", and a

"speech and debate" clause. International relations with other nations were barred without the consent of the Congress as were treaties between two or more States. The laying of imposts and duties was restricted, as was the power to engage in war, and the Congress was constituted the tribunal of "last resort on appeal" on all disputes and differences between two or more States. Coinage, weights and measures, regulation of trade and affairs with the Indians, and post offices, were placed in the exclusive hands of the Congress.

The U.S. Constitution, as adopted in convention on September 17, 1787, and later ratified along with the first 10 amendments, is the source of today's federalism. By it, the federal segment was itself constituted as a sovereign to the extent of those sovereign powers and functions delegated to it by each and all of the States in common, the delegation to the federal government was confined by various limitations and restrictions, the States themselves were limited and restricted in exercising sovereign powers in some respects, but otherwise than so dealt with the States retained their nature, status and powers as sovereign nations. The vast difference between this structure and relationship, in contrast to those between a State and its governmental subdivisions, is obvious.

Second, the questions of the authority of local government subdivisions of a State, and of pre-emption (which are different questions) are essentially questions of local and State law rather than of federal law. For this reason, considerations of comity and of recognition of the nature of our federal structure oblige a federal court to refrain from deciding such questions of State law when the courts of the State have not had opportunity to do so. When the State courts have spoken, of course, their statement of local law binds the federal courts in regard to its tenor.

While there are many decisions in respect to the extent of municipal power under the "general welfare" delegation of N.J.S.A. 40:48–2 (the section on which Newark relies

for enacting the ordinance in suit), and on the question of pre-emption, the court finds none dealing with the subject matter of this ordinance, and it accordingly refrains and abstains from any decision on these questions. Solely as an aid to the parties and to the State courts, some of the major materials found from the court's research is recorded here.

*Summer v. Teaneck*, 53 N.J. 548, 251 A.2d 761 (1969) thoroughly explores New Jersey law on both the question of municipal police power and on pre-emption. There is no need to review it in detail, or to discuss the earlier precedents or statutory pattern on which it rests. Suffice it to say that it found a municipal ordinance dealing with the particular adverse social effects of racial discrimination generated by the practice of "blockbusting" not to be beyond the scope of the police power delegated by New Jersey to its municipalities by N.J.S.A. 40:48–2. On the separate question of pre-emption, it found that it did not clearly appear that the Legislature intended to occupy the entire field, despite its regulation, through the Real Estate Commission, N.J.S.A. 45:15–1 *et seq.* of real estate brokers and salesmen and the Board's then Rule No. 26 directed at blockbusting, and despite its further treatment of the subject by the Law Against Discrimination, N.J.S.A. 10:5–12. The court saw a basis for legitimate local concern for a municipality to protect the interests of its own citizens.

Like the federal statute, New Jersey's Controlled Dangerous Substances Act is directed at the substances themselves, and not to any device or apparatus necessary or convenient for the use of a substance. The State statute goes beyond the federal law insofar as it denounces both the use, and the being under the influence of, a controlled dangerous substance for any other than defined legitimate purposes, N.J.S.A. 24:21–20b.[1]

New Jersey has, however, acted in respect to hypodermic syringes, needles, instruments or implements for subcutaneous injection of cocaine and narcotic drugs, as well as in other areas. By N.J.P.L. 1952, c. 209, it was made a disorderly act for anyone other than a physician, nurse, etc., to "sell, offer for sale, have or possess" a hypodermic syringe, needle, etc., for the purpose of injecting cocaine, etc., unless authorized by the certificate of a physician issued within one year prior thereto.

This law was repealed by N.J.P.L. 1955, c. 277 which itself enacted new provisions aimed at the same evil, N.J.S.A. 2A:170–77.3 to 77.7. And see *State v. Schrier*, 30 N.J. 241, 152 A.2d 578 (1959), and *State v. Smith*, 37 N.J. 481, 181 A.2d 761 (1962), *cert. den.* 374 U.S. 835, 83 S.Ct. 1879, 10 L.Ed.2d 1055. This Act was last amended by N.J. P.L. 1975, c. 98, largely to substitute the phrase "controlled dangerous substance" for the term "narcotic drugs". See, *Rodrigues v. Rosenblatt*, 58 N.J. 281, 277 A.2d 216 (1971); *State v. Ebron*, 61 N.J. 207, 294 A.2d 1 (1972), *In re A. H.*, 115 N.J.Super. 268, 279 A.2d 133 (App., 1971); and 3 Rutgers-Camden Law J., 361.

Still another enactment in this field is N.J.P.L. 1972, c. 143, N.J.S.A. 2A:170–25.17, which denounces the discard or abandonment of any hypodermic needle or syringe without destruction thereof (the Act appears to assume that the syringes are al-

---

1. The court does not address the potential effect of N.J. Senate Bill No. 3069, introduced January 25, 1979, as a supplement to the N.J. Controlled Dangerous Substances Act. The court is informed that the bill has passed both Houses, but has not been called for by the Governor for action. Since the 1954 legislative year, the New Jersey Legislature has never adjourned sine die until the first day of the next legislative year. As a result of this practice, the automatic 45 day veto session contemplated by *N.J.Const.* Art. V, sec. 1, par. 14(b) has not been convened. If the bill is not called for

by the end of the current legislative year in January, 1980, it may be filed in the State Library without signature.

The bill makes it an offense (a) to possess any "paraphernalia" (a defined term) with intent to violate the N.J. Controlled Dangerous Substances Act; and (b) to knowingly or intentionally manufacture, sell or offer for sale any "paraphernalia", or to possess with intent to manufacture, etc. If enacted, the pre-emption issue that may then arise will be one of state law best left for the state courts to address first.

ways of a plastic material other than glass since it requires them to be melted). This enactment reflects a concern for unintended misuse or injury, not unlike the concern reflected by N.J.S.A. 2A:170–25.16 (discard or abandonment of intact TV picture tubes in certain cases), and N.J.S.A. 2A:170–25.2 (discard or abandonment of refrigerators, freezers, etc., having a latched door, in places accessible to children).

New Jersey has also made it a disorderly act to grow marijuana, N.J.P.L. 1952, c. 106, N.J.S.A. 2A:170–25.1, and in the period when "glue sniffing" was popular among young people, it acted in that field, N.J.S.A. 2A:170–25.9 to 25.13 (1965, as amended 1971).[2]

The court has found no reported New Jersey decision on the subject of State law pre-emption, either in regard to the subject-matter of the challenged ordinance, or in regard to the New Jersey Controlled Dangerous Substances Act, or the various statutes mentioned in regard to sale or possession of hypodermic syringes or needles, the discard or abandonment thereof, the growing of marijuana, or the discard or abandonment of TV picture tubes or latched refrigerators, and the like.

In these circumstances the court is bound to follow the principles laid down by Judge Garth in *D'Iorio v. County of Delaware*, 592 F.2d 681 (CA–3, 1978), whose three-part test is met here on the State-law pre-emption issue, and under the circumstances of this case call for the exercise of discretion to abstain on the point.

This point is not the same as the matter of abstention in respect to some possible saving construction of the ordinance, if there be no pre-emption but if the ordinance be defective for vagueness or overbreadth.

Perhaps the best examples here are in the field of obscenity laws, an extremely difficult subject at best and one as to which the decisions of the Supreme Court of the United States over a period of time have left the legislative, legal and judicial community in a state of amorphous uncertainty.

In 1972, a three-judge court held a 1971 New Jersey obscenity statute unconstitutional for failure to clear the three hurdles specified by *Memoirs v. Massachusetts*, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966). See *Cine-Com., etc. v. Lordi*, 351 F.Supp. 42 (D.N.J., 1972). The same result was reached by a three-judge court in *Hamar Theatres v. Cryan*, 365 F.Supp. 1312 (D.N.J., 1973), although by that time a new test had been articulated by *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) and related cases.

Thereafter, following the grant of certiorari and the entry of orders vacating judgments of conviction and remand for further consideration in light of *Miller*, a New Jersey case reached the Supreme Court of New Jersey, *State v. DeSantis*, 65 N.J. 462, 323 A.2d 489 (1974). In that case a unanimous court adopted a saving construction, in statute-like text, 65 N.J. at 474, 323 A.2d 489, yet it felt obliged to set aside the convictions because neither the statute nor the existing decisions had given defendants fair notice and due warning of the limited saving construction, which was prospective only.

But, see, *Proprietary Ass'n. v. Board of Pharmacy*, 16 N.J. 62, 106 A.2d 272 (1954), where a unanimous court in an opinion by

**2.** Charges for alleged violation of a municipal ordinance are within the jurisdiction of the municipal court, N.J.S.A. 2A:8–21c, as are charges for violations of the disorderly persons law, N.J.S.A. 2A:8–21d. The county district courts share the criminal jurisdiction of the municipal courts on a concurrent basis, N.J.S.A. 2A:6–37.

Where a state law establishes a disorderly persons offense, as is the case in the examples given, the proceeding or charges of violation therefor go to the same court as would a municipal ordinance violation of the kind involved here. See *Knox v. Krause*, 152 N.J.Super. 278, 377 A.2d 960 (Law, 1977); *State v. Tamburro*, 137 N.J.Super. 51, 347 A.2d 796 (App., 1975). This pattern may be a factor in a state court on the matter of pre-emption under local law.

The N.J. Code of Criminal Justice does not seem to affect the statutes discussed. The ones on TV picture tubes and refrigerators are embodied in N.J.S.A. 2C:40–1; the others are saved from repeal by N.J.S.A. 2C:98–3, and all remain disorderly persons violations.

Mr. Justice Jacobs (who also wrote the court's opinion in *DeSantis*) directed the dismissal of a declaratory judgment suit to construe the term "nonpoisonous patent or proprietary medicines", as used in N.J.S.A. 45:14–29 on the ground that the matter was one for legislative consideration, and despite the fact that the record at the trial level did contain expert testimony in regard to a long list of specific medications adequate to allow declaratory adjudication for them in the absence of a general judicial articulation of the meaning of the statutory expression. It may be that this result was due, at least in part, to the failure to raise federal constitutional issues of vagueness and due process, issues which at the time were not advanced with the frequency they are today. Compare the perceptive opinion of Judge Colie, 27 N.J.Super. 204, 99 A.2d 52 (Law, 1953), at the trial level.

### Vagueness and overbreadth

▮ The concepts of vagueness and overbreadth are both grounded, so far as the States and their subdivisions are concerned, on the Due Process Clause of *U.S.Const.* Amend. 14.

This limitation on the exercise of the power of government finds its origin in Art. 39 of Magna Charta granted at Runnymede by King John June 15, 1215 (and recognized as valid despite the later Papal Bull declaring it void for duress):

"No freeman shall be taken or imprisoned, or disseized, or outlawed, or banished, or in any ways destroyed, nor will we pass upon him, nor will we send upon him, unless by the lawful judgment of his peers, *or by the law of the land.*" (Emphasis added).

As a limitation on the powers of the federal government, this concept was articulated in *U.S.Const.* Amend. 5:

"nor [shall any person] be deprived of life, liberty or property, without due process of law."

As a limitation of the power of government of the sovereign states, the same concept was articulated in *U.S.Const.* Amend. 14:

". . . nor shall any State deprive any person of life, liberty or property, without due process of law . . . ."

Vagueness fails to meet due process standards when the linguistic expression of the law is such as to not give fair notice and due warning of that which is prohibited. The fundamental rule is that all are presumed to know the law, whether actually aware of its existence or not; but when the law, even though known, is so vague as to meaning as to fail to communicate means for defining unlawful versus lawful conduct, due process has been denied.

Overbreadth is a different concept. Here, there is no vagueness; the terms are specific and clear. Yet, that which is forbidden reaches so far beyond the evil that the law addresses as to render it arbitrary, unreasonable or capricious. This defect has long been open to challenge on State law grounds, largely through the judicial review afforded by the common law writ of certiorari, at least so far as municipal ordinances or State agency rules and regulations are concerned. The cases indicate, however, that the same defect rises to federal constitutional levels when the overreach of the enactment intrudes into an area protected by the U.S. Constitution, the most common instance being that of free speech under *U.S.Const.* Amend. 1. See, for example, *Coates v. Cincinnati*, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971); *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Smith v. Goguen*, 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974); *Annotation to Ashton v. Kentucky*, 16 L.Ed.2d 1231, "Indefiniteness of Language [etc]"; *Lanzetta v. New Jersey*, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939), and Annotation immediately thereafter, 83 L.Ed. 893, et seq.; *Winters v. New York*, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1947), among others.

The concepts have been expressed on the broad question whether a challenged practice or policy violates the fundamental principle of liberty and justice, *Twining v. New Jersey*, 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97

(1906); and whether the claimed right is implicit in the concept of ordered liberty, or partakes of its very essence, *Palko v. Connecticut*, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937).

■ Legislation runs afoul of the Due Process Clause when it fails to give adequate guidance to those who would be law-abiding, to inform defendants of the nature of the offense, and guide courts in trying those accused. *Musser v. Utah*, 333 U.S. 95, 68 S.Ct. 397, 92 L.Ed. 562 (1948); *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1949); *Winters v. New York*, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948).

■ Those laws which lack the required definiteness or specificity may be held void for vagueness on their face, *Papachristou v. Jacksonville*, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972), or as applied, *Palmer v. City of Euclid*, 402 U.S. 544, 91 S.Ct. 1563, 29 L.Ed.2d 98 (1971), although this distinction appears to be related to the extent and scope of the remedy rather than to the defect of the law per se.

■ So far as plaintiff is concerned, the court sees no vagueness in the ordinance in respect to its inclusion of rolling papers or cigarette papers. Their advertising, display, sale or offer to sell is denounced simply because they are ordinarily used (among other things) for the smoking of marijuana. Although not specifically involved in this case, the same may be said for any syringe, needle, eye dropper, spoon or pipe. No mention is made of lamps, candles or matches.

In this sense, while the ordinance is specific rather than vague, it is extremely overbroad because it draws in articles whose major uses are overwhelmingly lawful. The fact that some ultimate user will apply an eye dropper, spoon, pipe or a package of cigarette paper for the unlawful

ingestion of controlled dangerous substances hinges on the subjective purpose or intent of that ultimate user and in no way inheres in the article itself. Those who deal in the articles are thus denounced on the basis of someone else's subjective purpose and intent, and the ordinance does not require any knowledge or intent thereof, much less any active participation. In this sense the ordinance is plainly overbroad, at least as applied to the plaintiff and its distribution chain except for the final buyer.[3]

The field of drug regulation, along with gambling and traffic in intoxicating liquors, has long been a legitimate subject for penal laws at all levels. So far does the public interest and welfare extend that at least for gambling and intoxicating liquors it has often been said that there are no limits to governmental power in these fields, and no constitutionally protected property rights. Yet it would be constitutionally overbroad to make it an offense to provide coin or currency to another merely because coin and currency are "ordinarily used" for gambling. It would be constitutionally overbroad to denounce the advertising, display, sale or offer to sell such articles as potatoes, barley, corn, sugar, molasses or yeast merely because these articles, as well as any other starch or sugar, can be fermented or used in fermentation to manufacture alcoholic beverages. The same applies to vessels and piping, which can be used for distillation.

The constitutionally protected rights invaded by overbreadth in this case as to this plaintiff include at least the right to own and deal in property consisting of cigarette papers, and to engage in interstate commerce therein. To the extent that the ordinance invades those rights, it is overbroad and unenforceable as applied to the plaintiff and those in the distribution chain who

---

**3.** If cigarette or "rolling" papers can be barred from being advertised, displayed, offered for sale or sold, on the ground that some people use them to make marijuana cigarettes, what would prevent the user from turning to some other kind of very thin or "tissue" paper for that purpose? The same question arises in respect to a "cooker", see definition in *McKoy v. U. S.*, 263 A.2d 645 (CA–DC, 1970). If spoons can similarly be barred, what would prevent an addict from fashioning a cooker from aluminum foil to liquefy heroin crystals?

are supplied by it. To this extent, plaintiff is entitled to a declaratory judgment in its favor.

### Injunctive relief

No injunctive relief seems appropriate. Courts generally assume that government officials will honor a declaratory judgment so long as it is in force, although they have the right of all litigants to seek reversal on appeal. Should they not so adhere, plaintiff remains free to seek injunctive relief by way of execution or enforcement of the declaratory judgment. The record at argument indicates that such supplemental proceedings will not be called for.

### Freedom of Speech

The court sees no need to deal with the freedom of speech issue as applied to commercial advertising or display. There is no suggestion that plaintiff's Bambu paper is advertised or displayed for use in rolling marijuana cigarettes. That kind of advertising or display might well be prohibited if narrowly drawn, but the record does not indicate any such activity to be an evil that the ordinance addresses.

### Other Issues

The disposition reached, both in regard to abstention and a limited declaratory judgment makes it unnecessary to decide the other issues presented.

Suffice it to say that at common law, any person who provided means to another to commit a crime could be held responsible as an "accessory before the fact"; one who joined in the commission of the crime (as the driver of the getaway car in a bank robbery) could be held responsible as an "accomplice"; while one who assisted a lawbreaker to conceal himself or to escape detection and arrest, could be held responsible as an "accessory after the fact".

By N.J.P.L. 1951, c. 344, to take effect January 1, 1952 (the revision of the former Title 2 of the 1937 Revised Statutes as Title 2A of New Jersey Statutes), a new provision was included, as N.J.S. 2A:85–14, embodying the "aiding and abetting" concept, along the lines of 18 U.S.C. § 2. This provision has been continued in the new Code of Criminal Justice, N.J.P.L. 1978, c. 95, effective September 1, 1979, as § 2C:2–6.

See, for example, *State v. Sullivan*, 77 N.J.Super. 81, 185 A.2d 410 (App., 1962); *State v. Jacques*, 99 N.J.Super. 230, 239 A.2d 252 (App., 1968); *State v. Smith*, 32 N.J. 501, 161 A.2d 520 (1960), *cert. den.* 364 U.S. 936, 81 S.Ct. 383, 5 L.Ed.2d 367.

In its best light, the challenged ordinance is aimed at persons who, at common law, were chargeable as accessories before the fact or as accomplices, and under present statutory law, are chargeable as aiders or abettors.

Nothing in this court's ruling is intended to insulate any person from being charged, as an aider or abettor, by knowingly and wilfully providing to another any implement, device or article for the unlawful use of any controlled dangerous substance, with the requisite specific intent and participation in the common purpose.